Strafford,
May 4, 1937.

ALICE F. RECORD *v.* ROCHESTER TRUST CO.

**2**

*Murchie, Murchie & Blandin* and *A. Inghram Bicknell* (of Massachusetts), (*Mr. Alexander Murchie* orally), for the plaintiff.

*Conrad E. Snow* (by brief and orally), for the defendant.

ALLEN, C. J.   In 1918 the defendant made a loan on a promissory note indorsed by two signers for the maker's accommodation.   Over their signatures were written the words "waiving demand and notice."   The plaintiff's deceased husband was the second signer.   He died before the note became due.   It was not paid at its maturity, and the executrix was not served with demand and notice.   Thereafter, and within one year from her appointment as executrix, the plaintiff gave the defendant her personal agreement to indemnify it against loss and guaranteeing payment of the note in consideration of its grant of an extension of the note.   At a later time, the note remaining unpaid, she gave her personal note for its amount with interest added, and at various times furnished security for it.   This note she has partly paid.

The plaintiff claims that her note was fraudulently obtained, and

she seeks its cancellation, the return of the security still held for it, and repayment of the payments made. Briefly stated, the charge of fraud is that an officer of the defendant whom she consulted and relied upon for assistance in the settlement of her deceased husband's estate took advantage of her trust and confidence in him and did not deal fairly with her in matters between the estate and the defendant, misleading her and making misrepresentations.

An important question is whether the plaintiff's deceased husband in indorsing the original note waived demand and notice. The waiver was written above his signature but another indorser's signature which was written below the waiver preceded his. The note was locally payable and is therefore to be interpreted according to local law.

Primarily the question is one of construction of a writing, but bearing on the question the meaning of a statutory rule of construction is involved. By the negotiable instruments law notice of dishonor may be waived. P. L., c. 312, s. 109. By the ensuing section (s. 110), "where the waiver is embodied in the instrument itself it is binding upon all parties; but where it is written above the signature of an indorser it binds him only." The waiver here was not thus embodied, and it is the plaintiff's position that by the statute the indorser whose signature immediately follows the waiver is the only one subscribing to it.

Decision is here confined to the special features of the indorsement. Both indorsers signed beneath the waiver at the same time, before delivery of the note to the payee, and for the maker's accommodation. As to the payee, it had no understanding of any difference between the indorsers in the liability each assumed to it, and it was wholly a matter of circumstance, with no intended legal effect, which signature preceded the other. No claim is made, and no evidence is presented to show, that the payee believed there was any variation in the terms of the contracts of the indorsers with it, or even that it had any doubts or question on the point. As the findings are understood, it was the payee's practice to treat an indorsed waiver as given by all indorsers signing below it unless it was specially indicated that they did not subscribe to it.

Under normal rules of construction in conformity with common understanding and universal business usage, when two or more persons sign a statement with no apparent difference in interest or application, the order in which they sign is of no effect in determining their resulting legal obligations. This principal is so axiomatic as a pre-

cept of common sense and is so imperatively demanded by considerations of business convenience that an exception to it can hardly be justified by anything less than an explicit legislative command.

But the question remains whether by statutory order a special exception is created by which precedence in signing is decisive of liability. Does the statute limit subscription to an indorsed waiver to the indorser whose signature immediately follows it? The statutory reference to the indorser in the singular instead of in the plural is not significant. In the construction of statutes, "Words importing the singular number may extend and be applied to several persons or things; . . . ." P. L., *c.* 2, *s.* 3. The statute does not in explicit terms say that only the first indorser is held to the waiver. It binds an indorser only when it is written above his signature. In ordinary and general meaning an indorser is any indorser; and the waiver is written above the signature of a second indorser as well as above that of the first. To import into the statute a meaning that the waiver is the agreement of only the first indorser when others are not shown to have indorsed in any difference of relation or understanding, would produce a rule with no fair reason to support it. "Waiving demand and notice" is naturally read "we waive demand and notice" when the waiver appears to be subscribed by more than one in equality of relation. No one signing above the waiver subscribes to it and no one in an exceptional position or using words excepting its application to his signature is bound by it. The statute is considered to impose no further limitation. Certainly no demand of justice may be urged for a more restrictive construction, and no business usage or convenience is known or brought to notice, to make such a construction reasonable. The "customs of merchants" and banking practice have not been shown to favor or observe a rule so peculiarly at odds with the way in which business in general is done.

It is recognized that the negotiable instruments law is legislation within the policy of country-wide uniformity. Coöperation among the states by enactment of the law secures uniformity in a large measure. The law itself is an attempt to codify and standardize the common law on the subject. It does not seek to alter the common law except to meet the exigencies of conflicting rules in different states. The objective of consistency and harmony requires that the construction of the legislation in other states be treated and receive authority as a part of their body of unwritten law. The decisions in other states upon the section of the law here under consideration have accordingly been examined. They are found to be in conflict

with the weight of authority appearing to deny the plaintiff's position. Some of the cases are declaratory only of the common law, but as the legislation is designed to express it and not derogate from it, such cases may fairly be grouped with those which pass upon the legislation. In support of the view here taken these may be cited: *Parshley* v. *Heath*, 69 Me. 90; *Johnson* v. *Parker*, 86 Mo. App. 660; *Central &c. Bank* v. *Company*, 79 W. Va. 782; *Confidential Finance Co.* v. *Monastersky*, 106 N. J. Law 14; *Farmers' &c. Bank* v. *Company*, 129 Cal. 263; *Loveday* v. *Anderson*, 18 Wash. 322; *Portsmouth Sav. Bank* v. *Wilson*, 5 D. C. App. 8. Reference is also made to Williston, Cont., (*Rev. ed.*) *s.* 1186.

A leading case upholding the rule that, *prima facie* at least, an indorsed waiver is the contract of only the person whose signature immediately follows it is that of *First Nat. Bank* v. *Wolfson*, 271 Mass. 292. The reasoning of the opinion is not convincing. The view was properly taken that the waiver was not "embodied in the instrument." But the court did "not intend to intimate that all indorsers would not be bound by signing under the waiver if it is so expressed as to indicate that all intend to be bound by its terms." The waiver in that case, as here, was neutrally singular or plural in its terms. Logically, and as language is customarily used, it applied to a number of indorsers as much as to one only. But the waiver would then be no more "embodied in the instrument" than if only one indorser subscribed to it. To-invoke the statute to hold only the first indorser a party to a waiver above his name and at the same time to say that the waiver may be so phrased as to make other indorsers parties to it seems to adopt a construction which is unreasonably technical. The issue whether "waiving" denotes the singular or plural is thought to be determinable by common-law rules of construction, and not by ascribing to the statute the force of a prescriptive edict to limit the terms of a waiver to a singular application if it does not clearly and definitely show a plural one. Of the rule that only the first indorser agrees to a waiver over his name when by its terms or otherwise it does not appear that other indorsers adopt it, there can be no just criticism. But that the statute lays down any rule for construing the terms of the waiver in saying what signers below it agree to it is thought to clothe the statute with a force and weight it was not intended to have.

In *Zisman* v. *Gateman*, 200 N. E. Rep. 556, a later Massachusetts case, a second indorser was held to have waived when it appeared that he intended to do so. The conclusion in *First Nat. Bank* v.

*Wolfson, supra,* that the second indorser's subscription to the waiver was not apparent seems to amount to a disregard of purpose and understanding. When, upon the issue of a subsequent indorser's agreement to a waiver above his signature, it is once admitted that parol evidence may be received of the circumstances under which he has signed, no effect of the statute to hold only the first indorser bound is really recognized. And the general rule that "The form of negotiable paper is only *prima facie* evidence of the relationship of the parties," parol evidence being competent to show the true relationship, is here in force. *Burque* v. *Brodeur,* 85 N. H. 310, 314, 315.

In *Murray* v. *Nelson,* 145 Tenn. 459, the court appears to have gone to the extreme length of limiting the application of an indorsed waiver to the indorser first signing it in all cases. Its view of the statute attributes to the legislature a purpose to require individual and repeated agreement to an indorsed waiver in place of collective ones and although contrary to the expressed intention of the parties. The case in result is a disaffirmance of the view that while each indorser's contract may be a separate one, a separate statement of its terms does not need to follow in consequence.

The conclusion is that except as controlled by the specific provisions of the negotiable instruments law, negotiable paper is to be construed like other contracts. When a note before delivery has accommodation indorsers above whose signatures is written a waiver of demand and protest in terms applicable to any one of them, the statute does not limit the application of the waiver to the first indorser. When the indorsers are in different relations, the issue of their agreement to a waiver above their signatures is the same, although the differing circumstances may lead to a construction by which the agreement is held not to be made by all of them. It is the normal problem of resolving doubtful language, which the statute does not assume to determine.

Since the plaintiff as executrix was bound by the waiver on the original note, no fraud was practiced on her in inducing her to assume personal liability for the note by the advice that as executrix she was liable for it. By the findings, if the estate of her deceased husband was liable upon the note, it would have been collected as a claim against the estate in the event of her refusal to give her personal guaranty for the payment. She is the sole legatee of her husband's will, and the personal liability she assumed increased her benefit from the estate by the exact amount of the note. The estate was solvent to at least such an extent. Its liability on the note was not defeated

by the omission of demand and notice, and no defence is now asserted on the ground that the defendant took the note in violation of the banking statute.

The court found in substance that the plaintiff's guaranty of payment of the original note was obtained through false representations of the defendant's official, aside from any statements about the liability of the estate upon the note. The finding is that he did not act "in equity and good conscience" towards her and gave her a "false sense of security." This, being a finding of fact and not a ruling of law, merely means that he did not act fairly and honestly in dealing with and in advising her.

The defendant excepted to the finding. The plaintiff asserts that the exception has no standing, for the reason that the defendant made no request for a special finding in its favor upon the issue, and thereby conceded the sufficiency of the evidence to support the finding made. It related to a material issue.

The defendant excepted to denials of its motions to dismiss the bill when the parties rested on their evidence. The motions were the same as one for a nonsuit or directed verdict in their effect to attack the sufficiency of the evidence on every issue material to establish liability. A special request that each issue be found unsustained for lack of evidence was not required, and the defendant therefore duly excepted to material findings on such ground, so far as it took exceptions to them. The opinion in *Freeman* v. *Pacific Mills*, 84 N. H. 383, cited by the plaintiff, clearly refers to issues submitted without objection and exception, and it imports no idea that special findings may not be questioned when requests for contrary findings have not been specifically made provided the general issue of evidence supporting a party's claim to a verdict or decree has been seasonably raised. In *Plourde* v. *Auclair*, 86 N. H. 303, also cited by the plaintiff, the exception was to an omission to make a special finding when no request for it had been made. A general request that facts be found does not place upon the court the duty to find all possible facts.

It is not necessary, however, to pass upon the exception in question. If the findings were sustained, it would not be enough to entitle the plaintiff to a decree. She must also show consequences of the fraud of a character which invokes equity to undo them or to compensate for them, as a condition of relief. No finding is made that the fraud led to the plaintiff's disadvantage. The liability of her husband's estate on the indorsed note existing, she suffered no harm in acknowledging it and acting in belief of it. She lost nothing by

the false sense of security which was brought about by the improper manner of doing business with her.

Damage is an element of fraud in the law. "In the action for a deceit, the gist of the action is fraud, accompanied with damage." *Hanson* v. *Edgerly*, 29 N. H. 343, 357. "He only who has trusted in and acted upon a falsehood to his injury can maintain an action." *Enfield* v. *Colburn*, 63 N. H. 218, 219. "Deception which does not cause loss is not a fraud, in the legal sense." *Desmarais* v. *Company*, 79 N. H. 195, 196.

The plaintiff, however, advances the theory that since fraud inhered in the agreement, she may rescind it in equity and likewise disaffirm the note she gave in pursuance of it, restoring the *status quo ante* by returning the indorsed note, however uncollectible it may now be. The theory disregards the principle that rescission is a remedy only for actionable fraud, as an alternative to a suit for damages without rescinding, or when it is required under equitable principles to accomplish justice. It is idle to say that there is any real restoration in returning a note which was worth its full amount when surrendered but has since become of no value. The right of rescission when restoration is impossible must be supported by urgent reasons. " 'A court of equity is always reluctant to rescind, unless the parties can be put back *in statu quo*. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it.' *Grymes* v. *Sanders*, 93 U. S. 55." *Thompson* v. *Currier*, 70 N. H. 259, 267.

The only result of the fraud here was to lead the plaintiff to take a course of action other than that she would have taken if deception had not been practiced, but with arrival at the same journey's end, and with no loss thereby incurred. No principle of equity permits rescission when its denial involves no loss. No profit to the defendant ensues by the denial. It has no more than rightly belongs to it. It has gained nothing from the fraud charged to it. On the other hand to grant rescission would unduly benefit the plaintiff. It would make her better off than if there had been no fraud. It would be a case of unjust enrichment. Equitable relief is the same as common-law remedies, in exclusion of a penal character. The courts do not reward one for being wronged, but act only to compensate and to prevent loss. Fraud not injurious is not material, whether it is actual or constructive. Breach of a duty of disclosure and good faith creates no remedial rights in enlargement of those which the law furnishes for a breach of duty to state the truth.

The defendant lost its right to proceed on the original note against the estate of the plaintiff's deceased husband. But thereby the interest of the plaintiff in the estate was enhanced by the amount of the defendant's claim against it. It would be inequitable for her to retain that enhancement of interest and at the same time rescind the guaranty and the note which she gave in performance of the guaranty. The defendant, not having misled the plaintiff to her prejudice or disadvantage, is subject to no estoppel in her favor. Hening's Digest, p. 571 (h). No fraud affected her choice whether to pay the note as a claim against her as executrix or to assume personal liability for it.

In all the cases cited by the plaintiff upon the point (*Page Belting Co.* v. *Prince*, 77 N. H. 309; *Sipola* v. *Winship*, 74 N. H. 240; *Copeland* v. *Reynolds*, 86 N. H. 110) fraud resulting in damage was a condition of the right of rescission. The principle that "a person is not permitted by his own wrong to profit at the expense of another" (Am. Law Inst., Restatement of Restitution &c., P. F. D., *s.* 3) does not impose upon the defendant an obligation to make restitution to the plaintiff, since she has suffered no harm from its conduct. It is not questioned that constructive fraud arising from relations of trust may result from conduct which would not sustain an action at law for deceit. *Cotton* v. *Stevens*, 79 N. H. 224; *Ib.*, 80 N. H. 175. But equity will nevertheless deny relief unless it is shown that the plaintiff has suffered harm either in the form of direct loss or of "an undue or unconscientious advantage" (Pomeroy, Eq. Juris., (3d *ed.*), *p.* 1555) which the defendant has thereby obtained. Evidence of harm in either respect is here lacking.

In 1926 the plaintiff mortgaged her summer residence in Maine as new security for her personal note. The bill seeks the cancellation of the mortgage upon a special claim of fraud inducing it distinct from the charge of fraud in connection with the note itself. It was found that in giving the mortgage she was led by the defendant's official to believe that it was a "mere formality" and that she would "have the property back," concluding that he "overstepped the bounds of equity and good conscience in his method of inducing her to execute" it. To this conclusionary finding the defendant excepted.

The plaintiff's testimony supports the finding that the mortgage was obtained through a fraudulent statement that it would not be taken and held as security for the note. But other facts defeat her right to its cancellation. If she herself had a fraudulent purpose in giving the mortgage, or if she waived or condoned the fraud practiced

on her, or if that fraud subjected her to no detriment, she has no right to relief on account of it.

The court has made no decree based upon his findings, but has transferred "the question of law . . . including that of proper decrees . . ." arising from the facts he found "and such other facts which were not in dispute" as the transfer of the record discloses. While this procedure is an unusual application of the statute (P. L., c. 315, s. 7) providing that questions of law presented in a superior court trial may be transferred to this court "upon a case or statement of facts reserved," it appears to be within the authority of the statute. Although the indisputable facts are not stated specifically, they are to be found from the record and are thus stated, if indirectly. The question of what conclusions must be drawn from certain evidence is one of law, which is transferrable in advance of ruling, as well as the more frequent question of what conclusions may be drawn therefrom.

Considering the reasons for the plaintiff's lack of right to cancellation separately, it appears that when the mortgage was given, a suit brought by a third party against the plaintiff as executrix and the defendant was pending. The defendant's official represented to the plaintiff that if the plaintiff in the suit against them prevailed, her real estate would be levied upon, and he proposed that she mortgage it to the defendant as a protection for it. She testified: "I owed the bank money, and I didn't want George Wallace to have it [the real estate]; I would rather the bank would have it than George Wallace, because I didn't owe him anything, and I did owe the bank something, and Mr. Bond said I would have to keep it on there a year or two, because it would look like collusion. 'Well,' I says, 'it looks like collusion, anyway, to me'." She further testified: ". . . the understanding with Mr. Bond was that it was just a protection for the bank, and that I understood that I was to have the property back. I didn't suppose I was giving it up, . . . ."

The only conclusion from this evidence, with allowance for the trial court's finding that the mortgage was understood by the plaintiff to be "a mere formality," is that she gave it with the purpose of defrauding a possible creditor. If the defendant was only pretendedly to have the property for security and the mortgage was to be cancelled when a safe passage of time had elapsed, her predominant, if not only purpose was to place the property beyond the reach of creditors. While she testified that she preferred to secure the defendant with the property than to have it taken by the prospective

judgment-creditor, the finding that the mortgage was an insincere transaction from which the defendant was to derive no benefit, precludes any finding that she acted in good faith. The situation is thus one where both parties have engaged in an undertaking with a wrongful purpose, from the legal incidents of which as between them equity does not bestow relief. *Brewer* v. *Hyndman*, 18 N. H. 9, 17; *Blake* v. *Williams*, 36 N. H. 39, 42. The case is in contrast with that of *Stockwell* v. *Stockwell*, 72 N. H. 69. In both cases litigation against the plaintiff was pending when the conveyances were made. But there the plaintiff did not necessarily act with an unlawful purpose "to obstruct the course of justice and defeat the collection of any judgment against her" (*Ib.*, 70), while here the plaintiff testified that the reason for her action was to prevent satisfaction of a judgment. Her motive was inconsistent with good faith. Committing fraud herself, she may not excuse it on the plea that the defendant's fraud led her to do so.

Soon after the mortgage was given the plaintiff was notified that the pending suit against her and the defendant had been decided in their favor. In 1929, in writing to the defendant's official about other security for her note, she referred to the mortgage as a reason for objecting to the sale of the other security. In 1932 she gave the defendant a mortgage of the personal property at the real estate which the mortgage in question covered. In 1934 it was proposed in writing by the defendant that the mortgaged property be sold, the proceeds to be applied towards payment of the note, and the plaintiff to give the defendant a deed of the property to facilitate the sale. The plaintiff declined to convey it for the stated reasons that she was in a position to sell it to the best advantage and that if the defendant made the sale, she feared a sacrifice of value. Thereafter a conference between her and representatives of the defendant took place, at which she took the position that she had already paid on the note "all that any body should." So far as appears, she made no claim of fraud until she brought this bill in 1935.

Thus, although she knew shortly after the real estate mortgage was given that the threat of its being taken by legal seizure was removed, she made no claim or demand for over eight years to have the mortgage discharged. On the contrary, during the period she definitely recognized it as a subsisting and valid security. Not only did she seek no discharge of it but she so expressed herself as in effect to disclaim any right to a discharge. While she has been found not chargeable with laches, no finding that she did not waive or abandon

12

her claim to a discharge has been made. But the finding is deemed a required conclusion from the indisputable facts. Her conduct in recognition of the standing of the mortgage as enforceable security when she knew the facts which she thought entitled her to its discharge was a relinquishment of the claim of fraud, and she thereby barred herself from contesting its validity upon the claim. Upon this ground also the right to cancellation must therefore fail.

If the plaintiff had been innocent of fraud or if she had not abandoned the claim of the defendant's fraud, the question would remain whether she would suffer loss or detriment or the defendant gain an undue and unjustified advantage by enforcement of the mortgage. If it were cancelled, the mortgaged property, for all that appears, would be subject to legal seizure in an action upon the note. Maine, Rev. St., *cc.* 90, 95, 96. Without proof of an actionable or equitable character of the fraud by which the mortgage was obtained, cancellation may not be ordered.

By reason of the conclusions reached other questions become immaterial.

*Bill dismissed.*

All concurred.